**DAVID E. SCHAFER**
Attorney-at-Law
A Professional Corporation
3131 Princeton Pike
Bldg. 3D, Ste. 200
Lawrenceville, NJ 08648
(609)439-7790
schafdave@gmail.com

RECEIVED
APR 25 2017
AT 8:30_____M
WILLIAM T. WALSH
CLERK

Honorable Douglas E. Arpert           April 9, 2017
Magistrate Judge
U.S. District Court
District of New Jersey

*United States v. Ishmael Abdullah*
Mag. No. 16-1525 (DEA)

Dear Magistrate Judge Arpert:

Please accept this letter-request to have Abdullah examined by a second expert, Gerald Cooke, Ph.D., as a supplement to our December 18, 2016 motion to have "Abdullah undergo a psychological examination pursuant to 18 U.S.C. §4241 (b) and 4247 (b) ...". Section 4247 (b) states, "A ... psychological examination ... shall be conducted by a licensed ... psychologist, *or, if the Court finds it appropriate, by more than one such examiner*" (emphasis added). We believe that the Court should find it appropriate to order a second psychological examination for the following reasons:

### A. THE BOP REPORT IS INSUFFICIENT

1. Dr. Zamano's Report at page 1, "DATES OF EVALUATION": There was no evaluation done on 1/27.
2. Report at page 1, 7th line from bottom: Abdullah was not evaluated "*throughout* the evaluation period." He was evaluated over three days (Friday, Monday and Tuesday) at the *end* of the evaluation period after a month of being housed at MCC.
3. Report at pages 1 and 2, "EVALUATION PROCEDURES": There was no reference to the 540 pages of medical records he requested on March 3 and that I e-mailed him the evening of March 5 (Exhibits 4 to 11). Since the three days of evaluations were done by March 3, Dr. Zamano must have considered these records important for the completion of his Report, so the lack of any mention of these pages shows the Report is insufficient.
4. Report at page 4, Abdullah's arrests of 10/1/13 and 5/1/09: A psychologist may not have the proper training to interpret an FBI rap sheet, but for Dr. Zamano to define these two dismissed cases as part of his "adult record" speak poorly as to his professional neutrality.

5. Report at page 6, lines 1 to 4: Abdullah's father's vivid recollection of memory lapses after Abdullah's surgery (i.e., after he had a bullet and bullet fragments in his head), lends great credibility to his short-term memory loss, since this was months before his arrest.

6. Report at page 6, "Monitored Telephone Calls and Emails at MCC-New York": We have not seen a CD of these phone calls and e-mails, which would certainly be helpful to the resolution of this issue. Without a second psychological evaluation, we would have to request that Dr. Zamano supply us with a CD of all of these records before he may have to travel to Trenton for a hearing pursuant to 18 U.S.C. §4247 (d). With a second evaluation of Abdullah by a psychologist of Abdullah's choosing that concurs with Dr. Zamano's findings as to the competency of Abdullah to assist his attorney in his defense, the CD and a lengthy hearing will probably be unnecessary. Any findings in the Report derived from these calls and e-mails may or may not be insufficient, depending upon further evaluation.

7. Communications between Abdullah and counsel, counsel and MCC, and counsel and Abdullah: It should be noted here that Abdullah and counsel communicated mostly through Abdullah's nephew for reasons outside the issue at hand. Counsel documented what his nephew relayed from Abdullah, which may or may not be dependable but which casts light upon Dr. Zamano's findings on the phone calls and e-mails between Abdullah and his nephew. Counsel also documented communications with MCC that are dependable and with the above shed light on the unprofessional and "last-minute" nature of Dr. Zamano's Report:

    a. 1/30/17: Counsel discovers from the U.S. Marshal that Abdullah is at MCC. The next day counsel sends MCC's medical department a one-page letter and thirteen narrative pages of Abdullah's post-gunshot brain injury history from Helene Fuld Hospital and Princeton Brain and Spine (Exhibit 1; the thirteen pages are summarized by Dr. Zamano at pages 4 to 6, "Medical History").

    b. 2/1/17: Nephew reports to counsel that Abdullah stated he was bleeding from his head, and counsel referred the matter to the U.S. Marshal, who responded and followed through appropriately.

    c. 2/15/17: Nephew reports to counsel that he is vomiting blood. Counsel can find nothing on the BOP website as to how he can contact MCC's legal counsel, so he sends MCC e-mails (Exhibits 2 and 3).

    d. 2/28/17: Abdullah calls me through a "counselor." Abdullah complains that Dr. Zamano "keeps saying I'm a liar." Counsel calls Dr. Zamano, who claims he never received our 1/31/17 package. Counsel did not ask whether Dr. Zamano received his 2/15/17 e-mails, but e-mailed him the "missing" 1/30/17 package documents. Although not recorded in his notes, counsel recalls this discussion with Dr. Zamano as one where he informed the doctor that this was not a question of Abdullah's mental illness in the usual sense, but one that centered on his ability to assist counsel in his defense. Dr. Zamano asked counsel whether Abdullah was going to testify, to which counsel replied he had no idea. This throws up a red flag in regard to the sufficiency of the Report for two reasons—first, that this issue was mentioned only once in the Report at page 13, line 10 from the bottom, in a conclusion without explanation ("He is capable

2

of testifying in his own defense"), and secondly, that this question can never be answered until the close of the Government's case at trial. Similar to the 540 pages Dr. Zamano originally thought to be important, an explanation as to how Abdullah would remember his testimony one day or one hour or one minute to the next, particularly on cross-examination, is absent from his report.

8. Report at page 7, line 3: "He also complained about this evaluator." There are no other details about Abdullah's complaints. He complained to me during the 2/28 phone call in front of his counselor, which probably made it back to the doctor. No doubt there were more complaints over the monitored phone calls and e-mails. Dr. Zamano would have been hard-pressed to interpret equivocal data he collected without bias against Abdullah.

9. Report at page 7, "PSYCHOLOGICAL ASSESSMENT" (First paragraph): "His test protocol was invalid and uninterpretable due to indications of grossly reporting psychopathology." Dr. Cooke informed me that the Minnesota test described here has five validity scales that may indicate malingering, and at least one of the scales that indicates malingering can also be elevated by genuine psychopathy. It is not clear to which scale Dr. Zamano is referring. This is another insufficient aspect of the Report. (Second paragraph): Dr. Cooke informed me that a subject's reading level is resistant to most types of brain damage, and that the California test could be compromised by a subject's inferior reading level. The Report is insufficient in that Dr. Zamano did not administer a reading test to Abdullah. Also, Dr. Zamano uses the phrases, "seemed uninterested", "appeared to put forth poor effort", "likely compromised" and "may not fully represent his true memory abilities." Even if counsel is incorrect as to Dr. Zamano's bias against Abdullah, the uncertain language used by Dr. Zamano indicates either that Abdullah gave little or no effort in the tests because of his belief in the bias, or Dr. Zamano is equivocal about the facts upon which he based his findings. (Third paragraph): "the possibility of malingering is raised when an individual achieves a score lower than chance." Put in lay terms, this is going to the roulette wheel three times in a row and hitting red 17 times out of 50. Frankly, this could happen on any unlucky day at the casino. A second evaluation should shore up any doubt if Abdullah is in fact malingering. Also, "His response style indicates he was aware of the correct response,..." Of all the obsequious statements and conclusions in the Report, this is the most mysterious. Dr. Zamano fails to describe the response style by which he read Abdullah's mind.

10: Report at page 9, "CURRENT MENTAL STATUS" (First Paragraph): "he appeared uninterested, unmotivated, and at times unwilling to cooperate.... For example, he sometimes took long pauses (i.e., one minute) prior to answering questions, which were typically answered with a 'not sure' response." Since this reminds counsel of trying to answer a question in a Commercial Paper class in law school, he can only submit that Abdullah *was not sure because he was not sure* after thinking about it.

11. Report at page 13, "RECOMMENDATIONS" (First Paragraph): After several pages explaining how and why Abdullah is a malingerer, he does not make a formal diagnosis of DSM-5 Malingering.

3

*Granted* ✱

If the Court were to grant our request, our fee and report schedule would be as follows:

1. Dr. Cooke's normal fee for an evaluation at Monmouth County Correctional Institution and a Report is $2,500, with perhaps another $150 for review of the Complaint and the thirteen narrative diagnostic report pages I had sent to Dr. Zamano. (He has already reviewed Dr. Zamano's Report free of charge).

2. Dr. Cooke would evaluate Abdullah within three weeks from the time the Court granted our request. He would submit a Report to me within three weeks after the evaluation, and whether it concluded the competency or incompetency of Abdullah, counsel would forward it to the Court and Government within twenty-four hours of receiving it.

In conclusion, the unusual physical circumstances of Abdullah's physical condition—namely, a bullet and bullet fragments still in his head—require a second opinion as to his short-term memory loss even if Dr. Zamano's Report was "excellent." In the studies relied upon in the field, probably very few of the subjects are similar to Abdullah due to the fact that it is unusual he survived. The extra two months and maximum three thousand dollars is well worth the possible future motions, appeals and petitions over Abdullah's competency to assist this or any future counsel in his defense.

*So Ordered*
*[signature] USMJ*

Respectfully submitted,

David Schafer

Cc: Brendan Day, AUSA Trenton (by e-mail)

4